**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Nevarez, Sr., et al., | No. CV-24-01154-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Mesa, et al., | |
| Defendants. | |

In June 2023, Robert Nevarez Jr. ("Decedent") died following an encounter with two police officers from the City of Mesa and two police officers from the City of Tempe. In this action, Alicia Nevarez ("Plaintiff"), the personal representative of Decedent's estate, has brought a claim for excessive force against all four officers and a *Monell* claim against both municipalities. Now pending before the Court are a pair of motions to dismiss filed by the various defendants. (Docs. 68, 69.) For the reasons that follow, the Mesa Defendants' motion is granted in part and denied in part and the Tempe Defendants' motion is granted in full.

## BACKGROUND

### I.    Factual Allegations

The factual allegations set forth below are derived from the operative pleading, the Third Amended Complaint ("TAC"). (Doc. 67.)

…

…

### A.    **The Parties**

Plaintiff is the personal representative of Decedent's estate.  (*Id.* ¶ 5.)

There are six Defendants in this action.  Two of those Defendants, the City of Mesa ("Mesa") and the City of Tempe ("Tempe"), are Arizona municipal organizations.  (*Id.* ¶¶ 6-7.)  The remaining four Defendants are individuals.  Peter Klepp and Tatum Falls ("the Mesa Officers") were employed by Mesa at all times relevant to this action.  (*Id.* ¶¶ 8-9.)  George Torres and Fidencio Armenta ("the Tempe Officers") were employed by Tempe at all times relevant to this action.  (*Id.* ¶¶ 10-11.)

### B.    **The Encounter**

The TAC alleges that "[o]n or about June 9, 2023, at or about 8:40 p.m., Defendants Klepp and Falls responded to a 9-1-1 call from a citizen requesting a welfare check on . . . Decedent."  (*Id.* ¶ 13.)  "Defendants Klepp and Falls discovered Decedent lying on the ground near the Tempe canal."  (*Id.* ¶ 14.)  "[T]he temperature was approximately 95 degrees Fahrenheit, at that time."  (*Id.* ¶ 15.)  The Mesa Officers then "physically restrained the Decedent and handcuffed him in the prone position while he was still lying on the ground, without any probable cause to do so."  (*Id.* ¶ 21.)  This was done "in an aggressive manner" involving "excessive force."  (*Id.* ¶ 22.)

"Decedent was exhibiting signs of physical distress while he was being handcuffed and restrained by Defendants Klepp and Falls."  (*Id.* ¶ 24.)  Despite this distress, "neither Defendant Klepp [n]or Defendant Falls took any action to render aid to the Decedent while the Decedent was in their custody."  (*Id.* ¶ 26.)

Soon after, the Mesa Fire Department ("Mesa Fire") arrived along with the Tempe Officers.  (*Id.* ¶ 29.)  "Defendants Klepp, Falls, Torres, and Armenta failed to take any action to render aid to the Decedent, despite Decedent's obvious physical distress.  Instead, Defendants further restrained the Decedent."  (*Id.* ¶ 30.)  Around this time, "[a]s a result of the unlawful actions of Defendants, as described herein, Decedent reacted in a defensive manner against the Defendants."  (*Id.* ¶ 31.)  "Defendant Klepp placed his knee on the Decedent's back, Defendant Falls used her knees to pin down the Decedent's right arm and

Defendant Armenta controlled the Decedent's feet while Defendant Torres controlled his feet at one point [and] later placed a spit mask on the Decedent." (*Id.* ¶ 32.) All the while, "Decedent was still handcuffed, showing signs of physical distress and lying on the ground in the prone position." (*Id.*) "Mesa Fire Department assessed the Decedent and requested that Defendant Torres administer Narcan to the Decedent." (*Id.* ¶ 35.) "Defendant Torres then gave the Decedent a dose of Narcan . . . nearly ten (10) minutes after arriving and thirty (30) minutes after Defendants Klepp and Falls originally handcuffed and restrained the Decedent." (*Id.* ¶ 36.) "Thereafter, . . . Klepp [and] Torres removed the handcuffs." (*Id.* ¶ 37.) Decedent was then transferred to Banner Desert Hospital at 9:45 p.m., where he died at 10:41 p.m. (*Id.* ¶ 38.) The cause of death was "cardiac arrest in the setting of cocaine toxicity, environmental heat exposure and prone positioning with restraints." (*Id.* ¶ 39.)

### C.    The Claims

Based on the preceding factual allegations, Plaintiff asserts two claims in the TAC.

In Count One, Plaintiff asserts a claim under 42 U.S.C. § 1983 against the Mesa Officers and the Tempe Officers "for violations of Decedent's constitutional rights under color of law," which the TAC then identifies more specifically as "Decedent['s] . . . right to be free from excessive, unreasonable and unjustified force" as guaranteed by "the Fourth Amendment to the United States Constitution." (*Id.* ¶ 69.) The TAC alleges that this "breach caused substantial personal injuries and damages to the Decedent and thereby the beneficiaries of Decedent's estate." (*Id.*)

In Count Two, Plaintiff asserts a § 1983 claim against Mesa and Tempe "for violation of [Decedent's] constitutional rights under color of law." (*Id.* ¶ 80.)[1] The TAC elaborates that, due to the municipal Defendants' alleged training and supervision failures and/or alleged implementation of certain policies, practices, and customs, they are liable for the Fourth Amendment violations allegedly committed by the individual Defendants. (*Id.* ¶¶ 80-94.)

---

[1]    The TAC contains two paragraphs 80s. This is the second one.

II.    <u>Procedural Background</u>

On May 17, 2024, the complaint was filed.  (Doc. 1.)  It identified the plaintiffs as Decedent's father and Decedent's two minor children.  (*Id.* ¶¶ 5-7.)

On August 9, 2024, the first amended complaint ("FAC") was filed.  (Doc. 29.)  It identified the plaintiffs as Decedent's father and the mother of Decedent's two minor children.  (*Id.* ¶¶ 5-7.)  It asserted four counts: (1) excessive force under § 1983 against the Mesa Officers and the Tempe Officers; (2) municipal liability under § 1983 against Mesa and Tempe; (3) a state-law wrongful death claim against Mesa and Tempe; and (4) a state-law assault and battery claim against Mesa and Tempe.  (*Id.* ¶¶ 68-109.)

On August 23, 2024, both sets of Defendants moved to dismiss the FAC.  (Docs. 32, 34.)

On February 18, 2025, the Court issued an order granting both motions to dismiss. (Doc. 47.)  The Court dismissed both § 1983 claims "[b]ecause Plaintiffs concede that neither of them has been appointed as the personal representative of Decedent's estate" and "it follows that they lack standing to assert the § 1983 claims appearing in Counts One and Two of the FAC."  (*Id.* at 7.)  As a result, the Court did not address Defendants' merits-based dismissal arguments directed toward the § 1983 claims.  (*Id.* at 7 n.2.)  The Court also declined to exercise supplemental jurisdiction over the state-law claims.  (*Id.* at 9-10.) Last, the Court granted leave to amend but specified that "the changes shall be limited to naming the personal representative of Decedent's estate as a plaintiff and clarifying that Counts One and Two are only being asserted by that plaintiff."  (*Id.* at 11.)

On March 21, 2025, Plaintiff filed the second amended complaint ("SAC").  (Doc. 50.)  The SAC identified Plaintiff as the "personal representative of the Estate of [Decedent]."  (*Id.* ¶ 5.)  However, that same day, Plaintiff filed a "notice of errata" stating that "[b]y error or mistake, Plaintiff mistakenly stated that [she] was the personal representative for the Estate of [Decedent].  However, in fact, Plaintiff is the personal representative of [Decedent's] statutory beneficiaries."  (Doc. 51.)  "Counsel for Plaintiff" requested that the Court "replace" the SAC with a "corrected" SAC attached as an exhibit

to the notice of errata.  (*Id.* at 1.)  The "corrected" SAC did not, however, designate any party as the personal representative of Decedent's estate.  (Doc. 51-1.)

On March 25, 2025, the Court issued an order concluding that because the SAC did not name the personal representative of Decedent's estate as the plaintiff, it exceeded the limited scope of leave to amend set out in the February 18, 2025 order.  (Doc. 56.)  The Court thus ordered the Clerk of Court to enter judgment and terminate the action.  (*Id.*)

On March 26, 2025, Plaintiff filed a motion for reconsideration stating that Plaintiff's counsel had made certain procedural errors that resulted in him erroneously stating that Plaintiff was not appointed as the personal representative of Decedent's estate, when in fact she had been appointed to serve in that capacity.  (Doc. 58.)

On April 30, 2025, the Court heard oral argument.  (Doc. 66.)  At the conclusion of oral argument, the Court orally granted Plaintiff's reconsideration request and stated that "[w]ithin seven days from today, Plaintiff must file a [third] amended complaint that is in compliance with the Court's 2/18/2025 order, namely adding Alicia Nevarez in her capacity as the personal representative of the estate and clarifying that Ms. Nevarez in her capacity as the personal representative of the estate is the sole plaintiff as to Counts 1 and 2."  (*Id.*)

On May 6, 2025, Plaintiff filed the TAC.  (Doc. 67.)  The TAC omits the state-law claims that were alleged in the SAC and specifies that Plaintiff is the personal representative of Decedent's estate.  (*Id.*)

On May 20, 2025, the Mesa Defendants filed the pending motion to dismiss.  (Doc. 68.)  That same day, the Tempe Defendants filed the pending motion to dismiss.  (Doc. 69.)  The motions are now fully briefed.  (Docs. 75, 76, 77, 78.)  Neither side requested oral argument.

…

…

…

…

**DISCUSSION**

I.    <u>Legal Standard</u>

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.    <u>Evidentiary Submissions Beyond The Pleadings</u>

A threshold issue is whether the Court may consider the body-worn camera ("BWC") footage provided by Defendants (Docs. 37, 39) when deciding the motions to dismiss.

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). For materials incorporated by reference, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."

1    *Marder*, 450 F.3d at 448.

2    **A.    The Parties' Arguments**

3    Defendants argue that "[i]n this case, Plaintiff was not at the scene of events

4    recounted in the SAC.  Therefore, the SAC necessarily recounts what was depicted in the

5    [BWC].  Plaintiff cannot evade dismissal by making allegations contrary to what is visible

6    in the BWC.  Furthermore, consideration of the BWC is supported by Rule 1, Federal Rule

7    of Civil Procedure and qualified immunity, for the just, speedy and inexpensive

8    determination of this action."  (Doc. 69 at 5-6.  *See also* Doc. 68 at 4 ["Videos, not attached

9    to a complaint but central to it, have been considered by courts in ruling on Fed. R. Civ. P.

10    12(b) pleadings."].)

11    In response, Plaintiff contends that "due to lack of discovery at this stage, Plaintiff

12    does not have all of the BWC evidence and there is discussion in the report that the BWC(s)

13    were turned off during the encounter."  (Doc. 75 at 3; Doc. 76 at 3.)  Plaintiff further

14    contends that "[t]he BWC footage starts with all 4 officers on the top of the Decedent while

15    he is in handcuffs face down on the ground.  It is unclear how long the Defendants had

16    been on top of the Decedent prior to the video starting."  (*Id.*)

17    In reply, the Mesa Defendants contend that "[w]ithout any support, Plaintiff states

18    that they do not have all of the body camera evidence.  This is false.  On August 8, 2024,

19    prior to discovery and to facilitate the meet and confer process, undersigned counsel

20    provided Plaintiff with the only three body camera videos that were recorded by the Mesa

21    officers."  (Doc. 77 at 2.)  The Mesa Defendants further contend that "[b]oth sets of

22    Defendants also attached the body camera to the first Motion to Dismiss, filed nine months

23    ago" and that "[n]ot once, in the litany of correspondence and pleadings that followed, did

24    Plaintiff make such a claim" nor does the BWC footage start with—or ever depict—four

25    officers on top of Decedent.  (*Id.*)    The Tempe Defendants express similar confusion

26    regarding Plaintiff's claim to have not seen all of the BWC footage.  (Doc. 78 at 3.)  The

27    Tempe Defendants contend that "[u]ndersigned counsel and the Mesa Defendants' counsel

28    both emailed a link to Plaintiff's counsel to download the BWC," and the Tempe

1    Defendants attach an exhibit to their motion purporting to be a "confirmation that
2    Plaintiff's counsel's assistant downloaded the Tempe BWC." (*Id.*) The Tempe Defendants
3    also dispute Plaintiff's claims about what the BWC footage depicts, including that four
4    officers were ever on top of Decedent. (*Id.* at 2-3.)

5        B.    **Analysis**

6        Although the BWC footage may pose a significant obstacle to Plaintiff's claims at
7    a future stage of this case, the Court cannot consider it when resolving the pending motions.

8        Defendants cannot satisfy the first element of the incorporation-by-reference test
9    because the TAC nowhere refers to the BWC footage. True, some courts outside the Ninth
10   Circuit have held that such an explicit reference is not required for incorporation by
11   reference. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). But this
12   Court must follow Ninth Circuit law, and the Ninth Circuit standard is clear that the
13   complaint must refer to the evidence. *Marder*, 450 F.3d at 448. Moreover, even if an
14   explicit reference weren't required, the TAC doesn't "necessarily rely" on the BWC
15   footage. The TAC alleges that its allegations are based, at least in part, on "the Mesa City
16   departmental report" (Doc. 67 ¶¶ 19-20) and the "Maricopa County Office of the Medical
17   Examiner's report" (*id.* ¶ 39).

18       Defendants' cited authorities do not alter this outcome. *Mayfield v. City of Mesa*,
19   131 F.4th 1100 (9th Cir. 2025), is distinguishable because the complaint in that case, unlike
20   the TAC here, expressly "refer[red] to" and "quote[d] from" the BWC footage. *Id.* at 1104
21   ("Because Mayfield's complaint refers to, and quotes from, the footage from the body
22   cameras worn by the MPD officers who stopped and arrested Mayfield, the district court
23   correctly held that the body camera footage was incorporated by reference into the
24   complaint.").

25       Meanwhile, in *Lihosit v. Flam*, 2016 WL 2865870 (D. Ariz. 2016), the court deemed
26   BWC footage incorporated by reference into the complaint because "Lihosit's complaint
27   necessarily relies on the circumstances surrounding his arrest. Defendants have submitted
28   a Video and transcript of the incident. While these are not 'documents' in the traditional

sense, they are essential to a full understanding of the events underlying Lihosit's complaint, and Lihosit does not dispute their authenticity. Therefore the Court considers the Video and transcript in deciding the present motion, and this consideration does not convert the motion to one for summary judgment." *Id.* at *3 (citations omitted). Similarly, in *Robles v. Cnty. of San Diego*, 2024 WL 3498497 (S.D. Cal. 2024), the court cited *Lihosit* with approval and followed the same approach. *Id.* at *7.

At first blush, these cases may appear to suggest a broader interpretation of the incorporation-by-reference doctrine—namely, that it is proper to consider BWC footage when the complaint necessarily relies on the "circumstances surrounding" the arrest rather than on the relevant "document" itself. Nevertheless, those cases are not precedential and the Court must follow the standard in *Marder*, which requires the complaint to refer to the challenged evidence itself. *Marder*, 450 F.3d at 448. Moreover, the docket in *Lihosit* reveals that the complaint in that case clearly and unequivocally referenced the BWC footage. (*Lihosit v. Flam et al.*, No. cv-15-01224-PHX-NVW (D. Ariz.), Doc. 25 ¶ 17 ["Flam jumped in claiming Carroll never make [sic] such a threat. This is when both officers started their cover-up to hide their negligent actions. Fortunately, Flam's body camera recorded the entire encounter, including Carroll's threat of bodily harm to Jeffrey."]). Thus, *Lihosit* does not support the expansive interpretation of the incorporation-by-reference urged by Defendants.

*Raudelunas v. City of Vallejo*, 2022 WL 329200 (D. Ariz. 2022), does not support Defendants' position for similar reasons. There, the complaint repeatedly referenced the BWC footage and the court explicitly premised its decision to consider the footage on the presence of those references. *Id.* at *1 ("Because plaintiff references and relies on the video footage explicitly in his amended complaint and has not disputed its authenticity or accuracy, the court *sua sponte* incorporates by reference the CD-ROM copy of the video footage from Officer Brown's body camera surrounding plaintiff's arrest and considers it in deciding defendants' motion to dismiss without converting the motion to one for summary judgment.") (citation omitted).

At any rate, Defendants' incorporation-by-reference request also fails for an additional reason.  Although Plaintiff does not dispute the authenticity of the BWC footage provided by Defendants, she indicates that she possesses only incomplete footage.  *Ring v. City of Chandler*, 2025 WL 254549, *3 (D. Ariz. 2025) ("Plaintiff asserts that she has not had the opportunity to review the evidence and disputes its introduction at this stage . . . . Therefore, the Court declines to incorporate by reference Exhibits 1–3.") (citation omitted).[2]

III.    Count One: Excessive Force Claim Against The Individual Defendants

A.    **The Parties' Arguments**

1.    The Mesa Defendants

The Mesa Defendants argue "Plaintiff's excessive force handcuffing claim is based upon [the] incorrect conclusion that the handcuffing was 'unlawful' and 'excessive.' Handcuffing by itself is not excessive force.  Instead, Plaintiff must establish that the handcuffs were overly tight and medical evidence must support a claim that the decedent suffered injury as a result of being handcuffed."  (Doc. 68 at 7.)  The Mesa Defendants further argue that "[g]iven the 911 call and suspicious behavior that the officers believed to be due to drug use, the Mesa officers were permitted to use handcuffs to detain the decedent, for his own safety, to allow the fire department to respond" and that "[i]n doing so, the officers did not use excessive force and did not leave the decedent in a prone position as alleged by Plaintiff."  (*Id.* at 7-8.)  The Mesa Defendants further argue that "[d]uring the minimal period of time that Officers Klepp and Falls used weight force on the decedent's lower back to keep him in place, he continued to freely move his head, neck and shoulders," that "the video shows that" "[n]either officer used both legs to hold the decedent in place," and that "[b]oth Officers Klepp and Falls removed their weight within a reasonable time after the decedent stopped struggling."  (*Id.* at 8.)  Last, relying on *Gregory v. County of*

---

[2]    The Court acknowledges that Defendants dispute Plaintiff's contention that she has not received all of the BWC footage and attach various documents to their motion papers that seem to corroborate this proposition.  Even so, the Court is disinclined to apply the incorporation-by-reference doctrine at this stage of the case where there is a dispute (even a weakly supported dispute) over authenticity and completeness.

*Maui*, 523 F.3d 1103 (9th Cir. 2008), the Mesa Defendants argue that the Officers Klepp and Falls are, at a minimum, entitled to qualified immunity.  (*Id.* at 9-12.)

### 2.    The Tempe Defendants

The Tempe Defendants contend that Count One "must be dismissed based on qualified immunity."  (Doc. 69 at 6.)  The Tempe Defendants argue that the BWC footage shows that when Officer Torres arrived, Decedent was already handcuffed and lying on his side; that Decedent then attempted to bite Officer Torres's ankle; and that Officer Torres then merely "took hold of Decedent's feet just to carry him from the gravel/concrete and back to the grass.  Torres controlled Decedent's foot for about 15 seconds to keep Decedent from kicking and moving away again, and to allow medics to do their work."  (*Id.* at 8.)  Given "the totality of the circumstances (based on the allegations . . . and the BWC)," the Tempe Defendants contend that the challenged control tactics were reasonable and not excessive.  (*Id.* at 8-10.)  In a related vein, the Tempe Defendants argue that "Plaintiff fails to sufficiently allege that controlling Decedent's feet caused him actual injury.  The Medical Examiner did not conclude that Decedent died because his feet were controlled for a few minutes.  Therefore Plaintiff does not and cannot allege that Armenta and Torres, in holding Decedent's foot for a short period of time, used unconstitutionally excessive force, or that a reasonable officer would have known that the law at the time clearly established such 'force' as unconstitutional."  (*Id.* at 9, citations omitted.)  The Tempe Defendants further argue that Officer Torres's use of "a spit mask, considering the totality of the circumstances was reasonable, and no precedent exists that clearly establishes that such an action is excessive force."  (*Id.*)  Last, the Tempe Defendants argue that the "allegations in the SAC . . . contradict the SAC's claim that Torres and Armenta failed to render Decedent aid.  Torres did render aid in the form of administering Narcan.  Moreover, the Mesa Fire Department had already been called before Torres arrived, and were on site when Armenta arrived.  That is what officers are required to do."  (*Id.* at 10-11.)

### 3.    Plaintiff's Response

In response, Plaintiff argues that, "[f]irst and foremost, Defendants' qualified

immunity argument is premature and should be denied without a response from Plaintiff." (Doc. 75 at 4.)[3]  Alternatively, on the merits, Plaintiff argues that the individual Defendants' conduct was unreasonable and excessive because "the decedent had not committed a crime that gave rise to probable cause for his initial detainment" and "[t]he Defendant Officers are the ones who caused the decedent to react to their unwanted and unlawful arrest.  The Defendant Officers are the ones who escalated the situation and decided to utilize unlawful and unreasonable force that led to [Decedent's] death."  (*Id.* at 5-6.)  Plaintiff also argues, relying on *Glenn v. Washington Cnty.*, 673 F.3d 864 (9th Cir. 2011), *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), and *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), that the individual Defendants were required to use "less forceful tactics" given their knowledge of Plaintiff's altered mental state; that the individual Defendants' control tactics were thus unreasonable under the circumstances; and that the individual Defendants "were on notice" based on *Glenn*, *Deorle*, and *Drummond* "that their actions towards the decedent were clearly prohibited."  (*Id.* at 5-7.)

### 4.    The Mesa Defendants' Reply

In reply, the Mesa Defendants argue that "[q]ualified immunity, because it is an immunity from suit, should be determined at the earliest practical time" and that "District Courts and the Ninth Circuit have upheld dismissals based upon qualified immunity at the Motion to Dismiss stage."  (Doc. 77 at 3.)  The Mesa Defendants further argue that the initial handcuffing of Decedent was reasonable and that "[i]t is undisputed that officers called for paramedics then affirmatively asked paramedics to come into the scene once the decedent was handcuffed.  Plaintiff does not identify any case law holding that it is a Fourth Amendment violation to restrain an individual—believed to be on drugs, swearing, and evidencing assaultive behavior—so that paramedics may come and safely treat and transport."  (*Id.* at 6.)  "As to the second phase of the encounter, it was only after the

---

[3]    Plaintiff's filings at Doc. 75 (response to the Mesa Defendants' motion) and Doc. 76 (response to the Tempe Defendants' motion) are identical, so the references to the brief at Doc. 75 encapsulate Plaintiff's response to both motions.

decedent began yelling, swearing, thrashing, and trying to bite that limited control holds were used to hold him in place to facilitate paramedics safely entering the scene" and "[t]here is no evidence that the decedent went into cardiac arrest when any of the Defendants were touching him.  The video plainly shows that paramedics were treating him, had hooked him up to a heart monitor, did not do CPR on the scene . . . ." (*Id.* at 6-7, emphasis added.)  Last, the Mesa Defendants argue that Plaintiff's cited cases are distinguishable and that *Gregory* compels dismissal based on qualified immunity.  (*Id.* at 7-10).

### 5.   The Tempe Defendants' Reply

In reply, the Tempe Defendants argue that "[t]he Response's citation-less assertion that considering qualified immunity is premature is wrong: addressing qualified immunity at the motion to dismiss stage is proper."  (Doc. 78 at 4.)  The Tempe Defendants reiterate their arguments regarding the reasonableness of their conduct and further argue that "Plaintiff does not identify a single case where an officer holding a person's foot briefly, and an officer applying a spit mask (provided by medics)—after the person bit or attempted to bite—was found to be excessive force."  (*Id.* at 5.)

B.   **Analysis**

1.   Two-Step Process For Analyzing Claims Of Qualified Immunity In Excessive-Force Cases

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Thus, "[w]hen an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right.  If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-trained officer would have known that his conduct was unlawful."  *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020)

(citation omitted).  "Although [courts] must view the facts in the light most favorable to the nonmoving party, when considering qualified immunity, [courts] are also limited to considering what facts the officer could have known at the time of the incident."  *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017).

When the defense of qualified immunity is raised in a § 1983 action involving a claim of excessive force, the first prong of the qualified-immunity analysis requires an assessment of whether the force used was "objectively reasonable," which "is determined by an assessment of the totality of the circumstances."  *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).  When evaluating the totality of the circumstances, courts must "balance the 'nature and quality of the intrusion' against the 'countervailing governmental interests at stake.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "To assess the gravity of the government interests, [courts] have typically considered (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citations and internal quotation marks omitted).  "Because this inquiry is inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Id.* (citation and internal quotation marks omitted).  With that said, the reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

For purposes of the second step's "clearly established" inquiry, "existing precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.  In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government

actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).  *See also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (cleaned up); *West v. City of Caldwell*, 931 F.3d 978, 983 (9th Cir. 2019) ("[W]e must locate a controlling case that squarely governs the specific facts at issue, except in the rare obvious case in which a general legal principle makes the unlawfulness of the officer's conduct clear despite a lack of precedent addressing similar circumstances.") (cleaned up).  On the other hand, "there need not be a case directly on point, or even one with fundamentally similar facts." *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 899 (9th Cir. 2024) (cleaned up).  *See generally Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding.  The same is true of cases with 'materially similar' facts."); *Scott v. Smith*, 109 F.4th 1215, 1229 (9th Cir. 2024) ("Plaintiff need not identify a factual twin.").

"The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (cleaned up).[4]  "[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citation omitted).  *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right

---

[4]    Although *Hughes* places the burden on the plaintiff, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017).  These opinions are difficult to reconcile.  *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed . . . error in suggesting that Defendants bear the burden of proof on the disputed qualified-immunity issues presented in this appeal . . . . [T]he applicable—and well-settled—rule [in the Ninth Circuit] is that the plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (cleaned up).

must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

  2. <u>The Mesa Officers</u>

  a. **Excessive Force**

Under the first step of the qualified-immunity analysis, the Court must determine whether the TAC's well-pleaded allegations, taken as true, are sufficient to state a claim for excessive force against Officers Klepp and Falls.

The parties' briefing is not particularly helpful on this point because many of the Mesa Defendants' arguments are premised on the BWC footage. But as noted in earlier portions of this order, the Court cannot consider the BWC footage at this stage of the case—it must confine the analysis to the well-pleaded allegations in the TAC.

The TAC alleges that Officers Klepp and Falls were responding to a "welfare check" when they found Decedent lying on the ground in the prone position, in 95-degree weather, not behaving in a threatening manner toward anyone. (Doc. 67 ¶¶ 13-15, 19-20.) The TAC further alleges that "[d]espite the Decedent's non-threatening demeanor, Defendants Klepp and Falls . . . handcuffed [Decedent] in a prone position while was still lying on the ground," performed the handcuffing "in an aggressive manner," and then pinned Decedent's torso to the ground using their knees and shins, all while Decedent was exhibiting signs of physical distress. (*Id.* ¶¶ 21-25, 32.) Finally, the TAC alleges that the medical examiner concluded that two of Decedent's causes of death were "environmental heat exposure" and "prone positioning with restraints." (*Id.* ¶ 39.)

When these allegations are taken as true, and when the Mesa Defendants' additional factual assertions based on the BWC footage—such as that "the body camera evidence establishes that Officers Klepp and Falls . . . did not keep [Decedent] prone" and that "the video shows that" "[n]either officer used both legs to hold the decedent in place" and "[b]oth Officers . . . removed their weight within a reasonable time after the decedent stopped struggling" (Doc. 68 at 7-8)—are disregarded, these allegations are sufficient to state a claim for excessive force under the *Graham* factors. First, the alleged use of force

was "severe and, under the circumstances, capable of causing death or serious injury." *Drummond*, 343 F.3d at 1056 (deeming upper-body pins severe uses of force and discussing the growing consensus that "compression asphyxia" is a serious use of force); *Scott*, 109 F.4th at 1223-24 ("Our precedent establishes that the use of bodyweight compression on a prone individual can cause compression asphyxia. . . . Drawing all reasonable inferences in Plaintiffs' favor, a jury could find Smith and Huntsman's conduct was similar deadly force."). *Cf. Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) ("Characterizing the amount of a non-lethal force can often depend on specific factual circumstances.").

The other relevant consideration is the government's interest in the use of force considering the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Based on the allegations in the TAC (and disregarding Defendants' characterization of the contents of the BWC footage), the first two factors favor Plaintiff. The TAC alleges that the Mesa Officers were responding to a "welfare check" and that Decedent's ultimate death was due in part to "cocaine toxicity." (Doc. 67 ¶¶ 13, 39.) Thus, at most, the crime that Defendant was suspected of committing was illegal drug use or public intoxication, neither of which is particularly severe. *Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1038 (D. Ariz. 2019), *aff'd*, 798 F. App'x 1015 (9th Cir. 2020) (suspicion of illegal drug use weighed in favor of plaintiff in government-interest analysis). The TAC also alleges that Decedent was found lying prone and "not behaving in a threatening manner." (Doc. 67 ¶¶ 19-21.) The last factor—whether the subject was actively resisting arrest—presents a closer call. The TAC alleges that "shortly []after" the initial handcuffing, "[a]s a result of the unlawful actions of Defendants," "Decedent reacted in a defensive manner against the Defendants." (*Id.* ¶¶ 29, 31.) The TAC is not clear on when this resistance occurred, but it can be plausibly construed as alleging that the resistance occurred after the initial detainment by the Mesa Officers and once the Tempe Officers arrived. Thus, it is at least plausible that some of the Mesa

1    Officers' alleged use of upper-body compression force occurred before Decedent's

2    resistance.  Moreover, the TAC doesn't provide enough details to discern the degree of

3    resistance or what that resistance entailed.  It is thus plausible (at least when Defendants'

4    characterization of the BWC footage is disregarded) that the resistance was minor or non-

5    threatening.  *Cf. LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000)

6    ("LaLonde admits that he initially resisted arrest . . . [but] if the extent of the injury to

7    LaLonde's back is serious enough, a jury could conclude that Horton used force in excess

8    of what was reasonable, even if LaLonde had been resisting at the time.  Also, another

9    factor weighing in LaLonde's favor is the fact that he was being arrested for a relatively

10   minor offense.").

11   Given this backdrop, and in light of the principle that "the determination whether

12   the force used to effect an arrest was reasonable under the Fourth Amendment should only

13   be taken from the jury in rare cases," *Green*, 751 F.3d at 1049, the TAC sufficiently pleads

14   an excessive force claim against the Mesa Officers.

### b.    Clearly Established Law

16   As a threshold matter, Plaintiff's contention that it would be "premature" to consider

17   the question of qualified immunity at the pleading stage (Doc. 75 at 4) is incorrect.

18   Although "[d]etermining claims of qualified immunity at the motion-to-dismiss stage

19   raises special problems for legal decision making," it is not verboten.  *Keates v. Koile*, 883

20   F.3d 1228, 1234 (9th Cir. 2018).  With that said, "[i]f the operative complaint contains

21   even one allegation of a harmful act that would constitute a violation of a clearly

22   established constitutional right, then plaintiffs are entitled to go forward with their claims."

23   *Id.* at 1235 (cleaned up).

24   On the merits, Plaintiff relies on *Drummond* for purposes of the second prong of the

25   qualified-immunity analysis, arguing that it placed the Mesa Officers "on notice that the

26   use of force utilized in this case on the date alleged in the [TAC] was unlawful and

27   constituted unreasonable use of force."  (Doc. 75 at 6-7.)[5]  In *Drummond*, two officers

28   _____

[5]    Plaintiff also cites *Deorle* and *Glenn*, but those cases are not remotely similar—in
the former, the challenged use of force occurred when an officer "fired a 'less lethal' lead-

responded to a call from the Drummond's neighbor that Drummond "was going to hurt himself by darting into traffic." *Drummond*, 343 F.3d at 1054. The police had dealt with Drummond before and knew him to be an emotionally disturbed individual. *Id.* Upon arrival, the officers noticed Drummond was hallucinating and in an agitated state, and they called an ambulance to take him to a medical facility. *Id.* In the meantime, the officers decided to "take him into custody, 'for his own safety.'" *Id.* The officers then knocked Drummond down, handcuffed him in the prone position, and applied bodyweight pressure to his back and neck with their knees, even though Drummond was not resisting. *Id.* Drummond soon "fell into respiratory distress" and repeatedly told the officers that "he could not breathe and that they were choking him." *Id.* Approximately 20 minutes later, after another officer arrived and the officers were able to bind Drummond's legs, Drummond went limp and lost consciousness. *Id.* at 1055. The officers then turned Drummond on his back and revived him with CPR. *Id.* Nevertheless, Drummond suffered brain damage and entered a "permanent vegetative state." *Id.* A medical expert later concluded that Drummond's condition was brought about by oxygen deprivation caused by "mechanical compression of his chest wall such that he could not inhale and exhale in a normal manner." *Id.* The Ninth Circuit held that the officers' conduct violated the Fourth Amendment's prohibition on the use of excessive force. *Id.* at 1059-60. The court elaborated: "The officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance. *Any* reasonable officer should have known that such conduct constituted the use of excessive force." *Id.* at 1061.

---

filled 'beanbag round' into the face of Richard Leo Deorle, an emotionally disturbed resident of Butte County, California, who was walking at a 'steady gait' in his direction," *Deorle*, 272 F.3d at 1275, and in the latter, the challenged use of force occurred when officers "shot Lukus with a 'less-lethal' beanbag shotgun, [then] fatally shot him eight times with their service weapons," *Glenn*, 673 F.3d at 866. Due to the obvious factual dissimilarity between those cases and this one, they do not qualify as Fourth Amendment precedents that "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer*, 868 F.3d at 1117.

When the analysis is confined to the version of the incident described in the TAC, without regard to the additional factual allegations proffered by Defendants based on the BWC footage, *Drummond* is sufficient to overcome the Mesa Officers' invocation of qualified immunity at this stage of the case. *Cf. Keates*, 883 F.3d at 1235 ("[O]ur decision at the motion-to-dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity were the case permitted to proceed, at least to the summary judgment stage and the court is presented with facts providing context for the challenged actions.") (cleaned up). Like the officers in *Drummond*, the Mesa Officers were responding to a welfare call and had no reason to believe Decedent was armed or harmful. Like the officers in *Drummond*, the Mesa Officers handcuffed Decedent and used their knees (and shins) to pin Decedent's upper body to the ground in the prone position. And like the plaintiff in *Drummond*, Decedent was exhibiting signs of physical distress during this process and later became unresponsive. These "'fundamentally similar' facts . . . provide especially strong support for a conclusion that the law is clearly established." *Hope*, 536 U.S. at 741.

Notwithstanding all of this, the Mesa Defendants argue that because the officers in *Drummond* tackled the decedent to the ground (whereas the Mesa Officers found Decedent already lying prone) and because the plaintiff in *Drummond* was not resisting (whereas Decedent was), *Drummond* is too factually dissimilar to suffice for qualified-immunity purposes. For related reasons, the Mesa Defendants contend this case is more akin to *Gregory*.[6] These arguments are unavailing. Even though Decedent was found prone (as opposed to being tackled into the prone position) and engaged in an unspecified degree of

---

[6] *Gregory* involved excessive force claims against police officers who, responding to a trespassing call, found a man (who was suspected of committing an assault) under the influence of drugs, behaving erratically and pointing a pen at them. 523 F.3d at 1105. The officers first tried to coax the man into giving up the pen, but after that failed, they took him down, pinned his torso to the ground in a prone position, and maintained control over him in that state as he resisted and repeatedly expressed his inability to breathe. *Id.* The police eventually succeeded in handcuffing him, but the man later became nonresponsive and, despite the officers' attempts to resuscitate him, died. *Id.* The Ninth Circuit held that the officers' use of force was reasonable and therefore not a violation of the Fourth Amendment, distinguishing it from *Drummond* in the process. *Id.* at 1107-08.

resistance at an unspecified time point in time against the officers (as opposed to none), these factual differences are not enough to render *Drummond* inapposite at this stage of the proceedings. *Scott*, 109 F.4th at 1229 ("Plaintiff need not identify a factual twin."). Indeed, based on the allegations in the TAC, this case is even more distinguishable from *Gregory* than it is from *Drummond*, as the officers in *Gregory* "had reason to believe that Gregory posed a threat to them, because he refused their requests, acted in an aggressive manner, and had already assaulted" a third party. *Gregory*, 534 F.3d at 1108-09.

Consequently, the motion to dismiss Count One as applied to the Mesa Officers is denied.

### 2.    The Tempe Officers

Even though many of the Tempe Defendants' arguments are premised on the BWC footage, the TAC itself does not allege that the Tempe Officers participated in the initial detainment, handcuffing, and pinning of Decedent. Nor does the TAC allege that the Tempe Officers placed their bodyweight on Decedent or controlled his upper body at any time. The TAC only alleges that Officer Armenta "controlled the Decedent's feet while [Officer] Torres controlled [Decedent's] feet at one point & later placed a spit mask on the Decedent." (Doc. 67 ¶ 32).

Courts "have discretion to address the 'clearly established' prong of the qualified immunity test first; if [they] conclude that the relevant law was not clearly established, [they] need not address the other prong concerning the underlying merits of the constitutional claim." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (internal quotation marks omitted). The Court will exercise its discretion to begin with the clearly established prong in relation to the Tempe Officers because it is dispositive. Plaintiff proffers no case in which a court found that merely controlling a suspect's feet or placing a spit mask on a suspect constituted excessive force. Moreover, as discussed above, the TAC establishes that at least once the Tempe Officers arrived, Decedent began to react "in a defensive manner." Under these circumstances, the Tempe Officers are, at a minimum, entitled to qualified immunity under the second prong of the analysis. *See, e.g., Farris v.*

1    *Oakland Cnty., Michigan*, 96 F.4th 956, 966 (6th Cir. 2024) ("Farris next claims that the

2    deputies used excessive force by putting a spit hood on her head.  But she identifies no case

3    that would have barred the deputies from temporarily covering her mouth and nose under

4    the circumstances. . . .  [R]easonable officers could believe that the Fourth Amendment

5    permitted them to temporarily use a spit hood as a preemptive measure on an

6    'uncooperative' detainee like Farris."); *Acosta v. City of Costa Mesa*, 718 F.3d 800, 826

7    (9th Cir. 2013) ("[W]hen later placing Acosta under arrest, Acosta was kicking and flailing

8    his body to actively resist the police.  Holding him by his limbs to control him and prevent

9    him from injuring an officer was also not unreasonable or excessive."); *Robinson v. Cnty.*

10   *of Shasta*, 384 F. Supp. 3d 1137, 1159-60 (E.D. Cal. 2019) ("The court has found no clearly

11   established law predating [the incident] that would put every reasonable officer on notice

12   that using a spit hood in this scenario constitutes a constitutional violation, and certainly

13   no authority that 'place[d] the . . . constitutional question beyond debate.'").[7]

14   IV.   Count Two: *Monell* Claim Against The Municipal Defendants

15        Defendants argue that Plaintiff's *Monell* claim in Count Two should be dismissed

16   because the TAC's allegations are bald conclusions insufficient to establish any policies,

17   training failures, or customs that contributed to the Mesa Officers' or the Tempe Officers'

18   challenged actions.  (Doc. 68 at 12-15; Doc. 69 at 11-14.)

19        In response, Plaintiff appears to concede as much: "Plaintiff's response to

20   Defendant's Motion to Dismiss Docket Nos. 68 and 69 does not address the *Monell* Claim

---

21

22   [7]    The TAC contains a fleeting allegation that the Mesa and Tempe Officers "failed to
     take any action to render aid" despite Decedent's obvious distress, instead choosing to
23   continue restraint (Doc. 67 ¶ 30).  As an initial matter, this allegation is undermined by
     other allegations within the TAC.  The TAC alleges that Mesa Fire was on scene, that
24   Officer Torres received Narcan from Mesa Fire and administered it to Decedent at Mesa
     Fire's behest, and that both Officer Klepp and Officer Torres removed the handcuffs from
25   Decedent at the direction of Mesa Fire.  (*Id.* ¶¶ 29, 35-37.)  The TAC's conclusory assertion
     that the officers "failed to render aid" is thus contradicted by the well-pleaded facts in that
26   same conduct.  Additionally, Count One of the TAC does not assert a "failure to render
     medical aid" claim against the individual Defendants—it only asserts an "excessive force"
27   claim.  (*Id.* ¶¶ 68-79.)  Finally, Plaintiff has not cited any law—much less any clearly
     established law—in support of such an unpleaded claim.  Consequently, to the extent
28   Plaintiff argues that the individual Officers' failure to render medical aid constitutes an
     independent basis for relief, that argument is rejected.

arguments. As such, Plaintiff agrees that that claim should be dismissed at this time and asks this Court to dismiss it without prejudice with leave to amend Plaintiff's [TAC]." (Doc. 75 at 7.)

Given Plaintiff's concession, Count Two is dismissed.

V.    Leave To Amend

As noted, Plaintiff seeks leave to amend with respect to Count Two. Defendants oppose this request and contend that Count Two should be dismissed without leave to amend. (Doc. 77 at 10-11; Doc. 78 at 7-8.) Defendants elaborate:

> Given [the procedural history] and the recent hearing on the Motion for Reconsideration, it is inconceivable that Plaintiff provided no substantive argument regarding the *Monell* claim, conceded that it fails, and seeks leave to amend. Prior to filing the second Motion to Dismiss—and despite the fact that Defendants have met and conferred multiple times over eight months— Defendants sent additional meet and confer correspondence identifying the deficiencies in the Second Amended Complaint (that persisted from every prior version of the complaint). Plaintiff did not agree that the *Monell* claim lacked merit then and, instead, forced Defendants to include the *Monell* claim within their arguments. Critically, these same arguments regarding the sufficiency of the *Monell* claim were included in the first version of the Motion to Dismiss and no effort was made to cure in the months that have passed between the first and second Motions to Dismiss. When this Court asked Plaintiff, at the Motion for Reconsideration Oral Argument, if he would seek to amend any other claims, Plaintiff said nothing about the *Monell* claim. This case cannot go on forever caught in a repetitive and never-ending cycle of amendments. If Plaintiff is granted leave to amend— without identifying how they are going to purportedly fix the deficiencies— there will likely be a Third Motion to Dismiss unreasonably delaying the case yet again.

(Doc. 77 at 10-11; *see also* Doc. 78 at 7-8 [incorporating by reference the Mesa Defendants' arguments.].)

The decision whether to grant leave to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.*

Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). With that said, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

Plaintiff's request for leave to amend as to Count Two presents a close call. This case is now more than a year old, the complaint has already been found deficient, dismissed, and amended several times, and Plaintiff has provided no explanation for why she refused to acknowledge the insufficiency of her *Monell* claim during the parties' meet-and-confer processes, only to concede its insufficiency after Defendants re-raised, in their motions to dismiss, the same concerns they had raised during the meet-and-confer processes. Additionally, Plaintiff makes no effort to identify, in her response brief, the changes she would make to her *Monell* claim in an attempt to cure the deficiencies she now concedes are present.

Although it is understandable why Defendants would view these circumstances as foreclosing further amendment attempts, the Ninth Circuit's decision in *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016), suggests that district courts must grant leave to amend even under these circumstances. There, as here, the defendants "fault[ed] [the plaintiff] for failing to announce his intention to seek leave to amend during the meet-and-confer conferences preceding the filing of their motions to dismiss," arguing that "if [the plaintiff] had announced his intention to seek amendment at that time, they could have avoided the expense of preparing their motions to dismiss." *Id.* at 1184. The district court agreed but the Ninth Circuit reversed, holding that such "litigation expenses incurred before a motion to amend is filed do not establish prejudice." *Id.* The Ninth Circuit also emphasized that the plaintiff did "not seek to assert a new legal theory and this [was his] first attempt to cure deficiencies in his complaint." *Id.* Here, too, Plaintiff is not attempting to assert a new legal theory, and even though there have been several previous

rounds of motion-to-dismiss briefing in this case, this is the first round that has resulted in an evaluation of the merits of the *Monell* claim.  Accordingly, although the Court is sympathetic to Defendants' bases for opposing the amendment request concerning the *Monell* claim, *United Healthcare* requires that this request be granted.  *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit . . . no matter how egregiously in error they may feel their own circuit to be.").[8]

Accordingly,

**IT IS ORDERED** that:

1.   The Mesa Defendants' motion to dismiss (Doc. 68) is **granted in part and denied in part**.

2.   The Tempe Defendants' motion to dismiss (Doc. 69) is **granted**.

3.   Count One of the TAC is dismissed as to the Tempe Officers and Count Two of the TAC is dismissed in full.

4.   Plaintiff may file a Fourth Amended Complaint within 14 days of the issuance of this order.  If Plaintiff does so, the changes shall be limited to alleging new facts in support of Plaintiff's now-dismissed *Monell* claim.  Additionally, Plaintiff shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

Dated this 22nd day of August, 2025.

_____
Dominic W. Lanza
United States District Judge

---

[8]   It should be noted that Plaintiff has not requested leave to amend with respect to Count One as it applies to the Tempe Officers.  And even if Plaintiff had requested leave to amend as to that claim, the request would be denied on futility grounds.  The deficiency as to that claim isn't a failure to plead sufficient facts, but a failure—after a full and fair opportunity to do so—to identify any clearly established law that would support an excessive force claim against the Tempe Officers.